UNITED AUTO WORKERS, LOCAL UNION 1112
et al., Appellants and Cross–Appellees,

v.

PHILOMENA et al., Appellees and Cross–Appellants.

[Cite as *United Auto Workers, Local Union 1112
v. Philomena* (1998), 121 Ohio App.3d 760.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 97APE01–69 and 97APE01–100.

Decided March 10, 1998.

762

*McTigue & Brooks* and *Donald J. McTigue,* for appellants and cross-appellees United Auto Workers, Local Union 1112 & 1714, United Auto Workers Region 2, U.A.W. Ohio State Political Action Committee, Anthony Zone and Robert Chambers.

*Christopher Lopez; Kalniz, Iorio & Feldstein Co., L.P.A., Ted Iorio* and *Christine A. Reardon,* for appellants and cross-appellees, Ohio Education Assn. and Affiliates.

*Betty D. Montgomery,* Attorney General, *Jeffrey S. Sutton, David M. Gormley* and *Diane R. Richards,* Assistant Attorneys General, for appellees and cross-appellants, Bob Taft, Secretary of State, Ohio Elections Commission, and Betty D. Montgomery, Attorney General.

*Paul J. Gains,* Mahoning County Prosecuting Attorney, *Diane Politi* and *James A. Philomena,* for appellee and cross-appellant James A. Philomena.

*Per Curiam.*

The appeal and cross-appeal presently before this court brings to our consideration the constitutionality of legislation included in Ohio's Campaign Finance Reform Act, Am.Sub.S.B. No. 8 ("S.B. 8"), and presents significant free speech and association issues.

Enactment of S.B. 8 in 1995 brought about major changes in Ohio's campaign finance law. Notable in the present appeal are certain provisions affecting public employees and labor organizations. As to public employees, S.B. 8 prohibits them from making voluntary political contributions by way of payroll deduction, and it prohibits a public employee from being solicited for, or from soliciting, contributions while the employee is performing official duties or is in an area where official state business occurs. As to labor organizations, S.B. 8 prohibits them from using their money to aid and support a political party, a candidate for public office, a political action committee ("PAC"), a legislative campaign fund, or any organization that supports or opposes any such candidate, for any partisan political purpose, or for political fundraising. Labor organizations wishing to

participate in this political activity must do so indirectly through a voluntary PAC which it must establish and administer. S.B. 8 also restricts from whom labor organizations may solicit contributions for its PAC and requires the solicitation to be in writing and limited to no more than four times a year.

Plaintiffs-appellants and cross-appellees brought an action challenging the facial constitutionality of S.B. 8 and sought declaratory and injunctive relief halting its implementation and enforcement. The action was originally filed in the Mahoning County Court of Common Pleas and was transferred to the Franklin County Court of Common Pleas on August 11, 1995.

Plaintiffs-appellants and cross-appellees are as follows: United Auto Workers Local Unions 1112 and 1714, unincorporated labor associations; United Auto Workers Regions 2 and 2B, unincorporated labor associations; United Auto Workers Ohio State Political Action Committee; Anthony Zone, the president of and a member of UAW Local 1112; Robert Chambers, the president of and a member of UAW Local 1714; the Ohio Education Association, an incorporated association; the Ohio Education Association–Educators Political Action Committee ("OEA–EPAC"); the Youngstown Education Association; John Senzarin, a member of the Youngstown Education Association who contributes to OEA–EPAC through payroll deduction; the Youngstown State University Chapter of the Ohio Education Associations; and the Poland Education Association, OEA/NEA ("appellants").

Defendants-appellees and cross-appellants are as follows: James Philomena, Mahoning County Prosecuting Attorney; Secretary of State Bob Taft; the Ohio Elections Commission; and Ohio Attorney General Betty Montgomery ("appellees").

Before the common pleas court issued its decision, the United States District Court for the Northern District of Ohio, Western Division, issued a decision on a preliminary injunction action enjoining enforcement of the following sections of the Ohio Revised Code as amended by S.B. 8: R.C. 3517.082(B)(3), 3517.082(D), 3517.09(C), 3599.031(H), and 3599.031(I) as it affects contracts in existence on the effective date of S.B. 8. The district court denied the requested preliminary injunction against R.C. 3599.03(A) and (B), 3517.102(D)(1), and 3517.092(F)(1) and (2). *Toledo Area AFL–CIO Council v. Pizza* (N.D.Ohio 1995), 898 F.Supp. 554. The district court subsequently lifted the injunction as to R.C. 3517.082(B)(3). *Toledo Area AFL–CIO Council v. Pizza* (N.D.Ohio 1995), 907 F.Supp. 263.

Following a consolidated bench trial on the merits of the complaint for declaratory and injunctive relief and the hearing on appellants' application for a preliminary injunction, the Franklin County Court of Common Pleas issued a decision and order finding unconstitutional R.C. 3517.082(D)'s requirements that all solicitation of contributions for a labor organization's PAC be in writing and

limited to four solicitations per year and enjoining enforcement of those provisions of R.C. 3517.082(D). As to the remaining challenged provisions of S.B. 8, the court found them constitutional and denied injunctive relief. Both sides appeal the trial court's decision and order.

Nine assignments of error are presented for review. Appellants OEA, OEA–EPAC, the Youngstown Education Association, John Senzarin, the Youngstown State University Chapter of OEA, and the Poland Education Association raise and argue assignments of error one through four; the UAW affiliated appellants raise and argue assignments of error five through nine. The assignments of error are as follow:

"ASSIGNMENT OF ERROR NO. 1:

"The Trial Court erred in upholding the constitutionality of Ohio Revised Code § 3599.031(H) and said Code provision's prohibition of all payroll deduction of voluntary political contributions from public employee pay checks, therefore terminating Intervenors–Appellants' collectively bargained check off agreements and individual payroll deduction authorizations. Relevant to payroll deductions the Trial Court further erred in upholding the constitutionality of Ohio Revised Code § 3599.031(I), which prohibits a public employee labor union and public employer from collectively bargaining any agreement allowing payroll deduction of voluntary political contributions which is contrary to Ohio Revised Code § 3599.031(H).

"ASSIGNMENT OF ERROR NO. 2:

"The Trial Court erred in upholding the constitutionality of Ohio Revised Code § 3517.092(F), and said Code provision's vague and overbroad restrictions upon the time, place, and manner of solicitations by and from public employees to political action committees, therefore permitting the obstruction of Intervenors–Appellants' efforts to communicate with their members in the workplace. Relevant to the time, place, and manner restrictions, the Trial Court further erred in failing to address, and thereby implicitly upholding, Ohio Revised Code § 3517.99(N)(1) and said provision's declaration that violation of the vague and overbroad restrictions of Ohio Revised Code § 3517.092(F) constitute a first degree misdemeanor.

"ASSIGNMENT OF ERROR NO. 3:

"The Trial Court, while properly declaring unconstitutional the provisions of Ohio Revised Code § 3517.082(D) which require a labor organization's solicitation of contributions from its members to be in writing, and not made more than four times during each calendar year, erred in failing to also specifically declare unconstitutional Ohio Revised Code § 3517.082(E), which prohibits public employ-

ee labor organizations from collectively bargaining any agreement contrary to Ohio Revised Code § 3517.082(D)'s restrictions.

"ASSIGNMENT OF ERROR NO. 4:

"The Trial Court erred in failing to order a preliminary and permanent injunction, enjoining implementation of the Ohio Revised Code provisions challenged in Assignments of Error No. 1, 2 and 3 herein.

"ASSIGNMENT OF ERROR NO. 5:

"The Trial Court erred in upholding the constitutionality of Ohio Revised Code §§ 3599.03(A) and (B), which prohibit the use of labor unions' funds or property to support or oppose a candidate or political party or for any partisan political purpose.

"ASSIGNMENT OF ERROR NO. 6:

"The Trial Court erred in failing to decide the constitutional challenge to Revised Code § 3599.03(F), which treats unincorporated associations other than labor unions more favorably than labor unions.

"ASSIGNMENT OF ERROR NO. 7:

"The Trial Court erred in upholding the constitutionality of Ohio Revised Code §§ 3517.082(D), 3517.09(C) and 3599.031(B), with respect to mandatory notices required in connection with solicitation of contributions.

"ASSIGNMENT OF ERROR NO. 8:

"The Trial Court erred in failing to decide the constitutional challenge to Revised Code §§ 3517.08(C), 3517.08(B)(2), 3517.102(B)(6)(b)(ii), 3517.102(B)(6)(b)(iii), and 3517.102(B)(6)(d), which treat 'continuing associations', political parties and 'legislative campaign funds' more favorably than labor unions or labor union political action committees.

"ASSIGNMENT OF ERROR NO. 9:

"The Trial Court erred in failing to decide the constitutional challenge to Revised Code § 3517.082(B)(3), which restricts the pool of persons from whom contributions may be solicited."

When the constitutionality of a statute is challenged, the state's interest in the contested statute is a key component of the analytical framework. Although Ohio does not have formal legislative history, the record contains evidence addressing the state's reasons for enacting S.B. 8.

During the 121st General Assembly, Senator Robert R. Cupp, Chairperson of the Ohio Senate Campaign Finance Reform Task Force ("Task Force"), sponsored S.B. 8. Governor Voinovich signed S.B. 8 into law on May 24, 1995, and it took effect on August 23, 1995. The Task Force received written testimony

regarding S.B. 8 and related campaign finance bills under consideration in the Senate. The record contains written testimony of Secretary of State Bob Taft and Senator Cupp submitted to the Task Force at the first informal hearing to consider campaign finance reform legislation held on January 25, 1995.

Secretary of State Taft testified that Ohio needed to reform its campaign finance laws and cited specific examples of skyrocketing campaign spending. Taft testified: "We must act now to begin the restoration of public confidence in the political process. Too many Ohioans feel their voices cannot be heard against the roaring tide of big money flowing into campaigns from special interest groups and wealthy contributors. Too many candidates feel that campaigns have become competitions for dollars, rather than contests of ideas." Taft identified five essentials of campaign finance reform: (1) contribution limits, (2) spending limits, (3) full disclosure, (4) a level playing field between business and organized labor, and (5) an income tax credit for campaign contributions.

In his written testimony, Senator Cupp stated that the public clearly lacked confidence in the integrity of the present system and that the major reason for this lack of confidence was the public's belief that large contributors were buying public policy—that the identity of legislators' campaign contributors determined the content of legislation. "We may protest that it isn't so—and it generally isn't—but appearance IS the voter's reality." The basic reforms Senator Cupp proposed to remedy, in an effort to restore public confidence, were contribution and carryover limits, disclosure requirements, and ensuring the voluntariness of contributions.

 This court undertakes review of the legislation at hand mindful of the strong presumption of constitutionality that cloaks legislative acts and that legislation's incompatibility with a constitutional provision must be established beyond a reasonable doubt before it is deemed unconstitutional. *Pack v. Cleveland* (1982), 1 Ohio St.3d 129, 134, 1 OBR 166, 171, 438 N.E.2d 434, 439–440; *State ex rel. Jackman v. Court of Common Pleas of Cuyahoga Cty.* (1967), 9 Ohio St.2d 159, 161, 38 O.O.2d 404, 405, 224 N.E.2d 906, 908–909.

 "In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall." *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, paragraph one of the syllabus. There are few Ohio cases interpreting Ohio constitutional provisions because the parallel federal provisions have usually been construed as imposing restrictions upon state action the same as or greater than the Ohio provision. *Preterm Cleveland v. Voinovich* (1993), 89 Ohio App.3d 684, 690, 627 N.E.2d 570, 574. Courts can rely on cases interpreting parallel federal provisions when considering a claim that state action has violated

the Ohio Constitution unless the Ohio provision imposes greater restrictions. See *Preterm* at 690, 627 N.E.2d at 574.

Appellants rely exclusively on the Ohio Constitution to support their constitutional challenge to S.B. 8. However, consistent with the above discussion, they rely heavily on federal case law, as will this opinion.

In their first assignment of error, appellants assert that the trial court erred in upholding the constitutionality of R.C. 3599.031(H) and (I), which prohibit payroll deduction of voluntary political contributions by public employees and render unenforceable any collective bargaining agreement provision providing for this deduction.

R.C. 3599.031(H) and (I) provide as follows:

"(H) No public employer shall deduct from the wages and salaries of its employees any amounts for the support of any candidate, separate segregated fund, political action committee, legislative campaign fund, political party, or ballot issue.

"(I) In addition to the laws listed in division (A) of section 4117.10 of the Revised Code that prevail over conflicting agreements between employee organizations and public employers, this section prevails over any conflicting provisions of agreements between labor organizations and public employers entered into pursuant to Chapter 4117. of the Revised Code."

Citing the corruption potential presented by the knowledge public employers would obtain from administering payroll deduction of political contributions for employees under their supervision, the trial court concluded that R.C. 3599.031(H) served the government's compelling interest of promoting bipartisan public support of government, confidence in the system of representative government, and reduction of partisan pressure on or by public employees.

In support of their first assignment of error, appellants assert that, under the Ohio Constitution, the prohibition of voluntary political payroll deductions by a public employee results in an unconstitutional impairment of contract under Section 28, Article II, of the Ohio Constitution; violates the Equal Protection Clause of Section 2, Article I of the Ohio Constitution; is an unconstitutional restriction on speech under Section 11, Article I of the Ohio Constitution, as enhanced by Section 1, Article I of the Ohio Constitution; and is so overbroad that it violates due process under Section 16, Article I of the Ohio Constitution.

The Ohio Supreme Court has held that Ohio's equal protection limits are almost identical to its federal counterpart. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 424, 633 N.E.2d 504, 512. Additionally, the court has stated that the free speech guarantees of Section 11, Article I of the Ohio Constitution are no broader than the First Amendment, and that the First Amendment is the proper

basis for interpreting Section 11, Article I of the Ohio Constitution. *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222, 626 N.E.2d 59, 61.

■ There are two ways for a statute to be facially invalid: (1) it is unconstitutional in every conceivable application, or (2) it is overbroad—that is, it prohibits a substantial amount of constitutionally protected conduct. *Members of the City Council of Los Angeles v. Taxpayers for Vincent* (1984), 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772, 781.

Before the enactment of S.B. 8 and its amendments to Ohio's campaign finance laws, R.C. 3599.031 authorized "any employer" to administer a voluntary political checkoff for its employees. S.B. 8 amended R.C. 3599.031 by eliminating a public employer's authority to deduct voluntary political contributions from an employee's wages or salary. R.C. 3599.031(H). Thus, the privilege of political contribution payroll deduction, previously available to all employees, has been taken away from public employees and is now granted only to private sector employees. The General Assembly's rescission of this privilege only as to public employees raises equal protection and free speech issues.

■ Under the Equal Protection Clause, when a statutory classification impinges upon the fundamental right to engage in political expression, the classification must be narrowly tailored to serve a compelling government interest. *Austin v. Michigan Chamber of Commerce* (1990), 494 U.S. 652, at 666, 110 S.Ct. 1391, at 1401, 108 L.Ed.2d 652, at 668–669. Whether a government benefit is characterized as a right or a privilege is not determinative; the question is whether denial of a right or privilege infringes upon an individual's liberty of expression. *Elrod v. Burns* (1976), 427 U.S. 347, 361, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547, 558.

■■ A preliminary inquiry is whether granting to any employer but a public employer the authority to administer for its employees payroll deduction of voluntary political contributions impinges on a fundamental right of public employees. Political contributions are protected First Amendment speech. *Buckley v. Valeo* (1976), 424 U.S. 1, 14–16, 96 S.Ct. 612, 632–633, 46 L.Ed.2d 659, 684–686. However, the question presented is whether a prohibition on a *method* of making a political contribution that the state allows private employers, but not public employers, to administer encroaches on the fundamental right to engage in political expression. Although it is the employer who must have authorization before it may administer payroll deduction of political contributions, fundamentally it is the employee's right of expression that is at stake. R.C. 3599.031(H) prevents public employees from arranging with their employer to take advantage of a method of making a political contribution that the General Assembly has made available to all other employees. That there is no constitutional right to

payroll deduction for political contributions does not end the inquiry. If authorizing private employee payroll deduction for political contributions makes it easier for private employees than public employees to engage in political expression, R.C. 3599.031(H) infringes upon the political expression rights of public employees. Cf. *Fed. Election Comm. v. Massachusetts Citizens for Life* (1986), 479 U.S. 238, 255, 107 S.Ct. 616, 626, 93 L.Ed.2d 539, 554–555 (*"MCFL"*) (If the practical effect of a statute is to discourage protected speech, it infringes on First Amendment activities).

The record establishes that for many employees, including public employees, payroll deduction is the most advantageous way to make political contributions. In his affidavit, William Sundermeyer, the executive director of OEA, averred that of the approximate 13,000 to 14,000 members who contribute to OEA–EPAC annually, seventy-five percent do so via payroll deduction. In his deposition, Sundermeyer stated that it is easier for people with limited amounts of available funds to contribute an amount in numerous small increments than to write one check for the total amount. Significant to this court is the reality that for people on a budget, donating to causes they support is easiest if they may do so in small weekly, biweekly, or monthly increments. Accordingly, this court finds that making payroll deduction for political contributions available to private employees, but not public employees, disadvantages public employees and impinges upon their free speech rights.

■ Because payroll deduction makes it easier for private employees to engage in political expression, R.C. 3599.031(H) places an unequal burden on public employees and must be tailored to serve a compelling government interest. *Williams v. Rhodes* (1968), 393 U.S. 23, 31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24, 31–32; *Police Dept. of the City of Chicago v. Mosley* (1972), 408 U.S. 92, 101–102, 92 S.Ct. 2286, 2293–2294, 33 L.Ed.2d 212, 220–221. The test for determining if the state has met this strict equal protection standard is whether the state has demonstrated that the regulation is necessary to further a compelling state interest. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 289, 595 N.E.2d 862, 867; *Dunn v. Blumstein* (1972), 405 U.S. 330, 342–343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284–285.

When the government restricts speech of a person because the person is a public employee, the Supreme Court applies a distinct analytical framework. *United States v. Natl. Treasury Employees Union* (1995), 513 U.S. 454, 465–467, 480–481, 115 S.Ct. 1003, 1012–1013, 1020, 130 L.Ed.2d 964, 978–980 (*"NTEU"*); *Waters v. Churchill* (1994), 511 U.S. 661, 673–674, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686, 698–699. Under this analysis, the government's interest in achieving its goals as efficiently and effectively as possible is elevated to a significant government interest. *Id.* at 675, 114 S.Ct. at 1888, 128 L.Ed.2d at 699–700. The

government depends on its employees to achieve its goal of efficient and effective operation; consequently, restrictions on employee speech that affect the government's ability to operate may be appropriate even though the restrictions would be inappropriate if imposed on the general public. *Id.* at 675, 114 S.Ct. at 1888, 128 L.Ed.2d at 699–700.

Interests related to the government employer's interest in promoting efficiency and integrity in the discharge of government operations include maintaining proper discipline, impartial execution of the law, merit-based advancement, and attracting qualified workers by ensuring job security and protecting employees from political extortion. *United Pub. Workers of Am.* v. *Mitchell* (1947), 330 U.S. 75, 96–97, 67 S.Ct. 556, 568, 91 L.Ed. 754, 770–771; *United States Civ. Serv. Comm. v. Natl. Assn. of Letter Carriers* (1973), 413 U.S. 548, 565–566, 93 S.Ct. 2880, 2890–2891, 37 L.Ed.2d 796, 808–810; *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 606, 93 S.Ct. 2908, 2912–2913, 37 L.Ed.2d 830, 836. *Mitchell, Letter Carriers,* and *Broadrick* addressed the constitutionality of the provision in Section 7324(a)(2), Title 5, U.S.Code, the Hatch Act, prohibiting federal employees from taking "an active part in political management or in political campaigns." Ohio has an analogous law that applies only to classified public employees. R.C. 124.57.

At the same time that the Supreme Court has recognized the unique interests the government has as an employer, it has also recognized that public employees do not relinquish First Amendment rights by virtue of accepting government employment. *Pickering v. Bd. of Edn. of Twp. High School Dist. 205* (1968), 391 U.S. 563, 566–568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 815–817.

When a restriction on public employee expression is challenged on First Amendment grounds, to resolve the competing interests of the government as employer and the public employee as a citizen with a right to comment on matters of public concern, the court applies a balancing test. *NTEU,* 513 U.S. at 466–467, 115 S.Ct. at 1013, 130 L.Ed.2d at 979–980, following *Pickering* and *Letter Carriers.* The government bears the burden of justifying regulations imposed on public employees. *Tucker v. California Dept. of Edn.* (C.A.9, 1996), 97 F.3d 1204, 1210.

When the government regulates speech of public employees to redress past harms or prevent future harms, a heightened burden applies. The government " 'must do more than simply "posit the existence of the disease sought to be cured." * * * It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.' " *NTEU,* 513 U.S. at 475, 115 S.Ct. at 1017, 130 L.Ed.2d at 984–985, quoting *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.*

(1994), 512 U.S. 622, at 664, 114 S.Ct. 2445, at 2470, 129 L.Ed.2d 497, at 531–532. Thus, a First Amendment analysis of R.C. 3599.031(H) is similar to the applicable equal protection standard requiring the state to demonstrate that the restriction is necessary to further a compelling government interest.

██ Appellees' justification for denying public employees the privilege of making political contributions, via payroll deduction, consists of relying on interests the Supreme Court has recognized when upholding the constitutionality of the Hatch Act's prohibition of partisan political activity: Prevent political corruption and appearance of corruption in the public workplace, ensure that public employees are not coerced into making contributions, avoid entangling alliances between public sector employment and political parties, and prevent politicization of government offices. However, the Hatch Act does not prohibit federal employees from making political contributions, and it does not prohibit methods of contributing. Appellees have provided no independent rationale or evidence to establish that prohibiting political payroll deduction directly and materially promotes their interest in separating themselves from partisan politics.

This court sees no close connection between allowing political contributions to be made by way of payroll deduction and concerns that employees will feel coerced to make contributions or do so, not to express personal belief, but to curry favor. R.C. 3517.092 addresses scenarios that have a close connection to this concern. R.C. 3517.092 prohibits soliciting or accepting contributions to an elected state or county officer or candidate for such an office from a public employee whose appointing authority is this officer or whose appointing officer is appointed by the elected officer; or when the employee functions in or is employed in or by the same public agency, department, division, or office as the elective office. Additionally, Sundermeyer's affidavit indicates that out of OEA's total membership of 113,353, 13,000 to 14,000 members contribute annually to OEA–EPAC an average contribution of $30; these figures do not suggest that OEA members are coerced to contribute to OEA–EPAC.

As to the concern that an employee may face reprisals based on a political contribution, the employee does not have to make a contribution via payroll deduction.

Once an employee completes written authorization, payroll deduction proceeds with no direct employee involvement. The employee's use of payroll deduction to make political contributions is completely separate from the employee's performance of the employee's official duties. Nor is the payroll deduction process a highly visible or public act. In turn, the state's involvement is limited to transmitting a portion of the employee's wages to a political party or organization at the employee's request. Consequently, minimal concerns of creating the

appearance of improper political influence over government operations are presented.

The concern that payroll deduction results in state subsidization of an employee's political speech is not compelling. R.C. 3599.031 provides for the administrative cost to be deducted from the amount transmitted.

In light of the long history of this practice, surely, if it posed a genuine threat to any of the important state interests appellees have identified, there would be ample evidence of harm. No such evidence has been put before this court, even though R.C. 3313.262 allowed teachers to have political contributions deducted from their wages and salaries for over twenty-one years until its repeal effective August 22, 1995, and R.C. 3599.031's authorization applied to any employer including public employers from 1974 to the enactment of S.B. 8.

The cases appellees have cited to support the constitutionality of the deduction restriction are not dispositive or persuasive. In *S. Carolina Edn. Assn. v. Campbell* (C.A.4, 1989), 883 F.2d 1251, the contested statute authorized payroll deductions for dues, not political contributions, to one state employee association but not another state employee association. The court found no infringement on protected First Amendment speech of the labor organization or its members. In *Washington Edn. Assn. v. Smith* (1981), 96 Wash.2d 601, 638 P.2d 77, a statute authorized certificated employees of school districts to make contributions to political action committees by way of payroll deduction, but no statute authorized payroll deduction of political contributions for community college teachers and other state employees. The court found only a tangential infringement on the constitutional rights of free speech and association and found no First Amendment violation. The court also found no equal protection violation because the plaintiff had not met its burden of proving the classification arbitrary and unreasonable. This court has determined that authorizing private employers but not public employers to administer payroll deduction to make political contributions for their employees burdens First Amendment rights of public employees.

In *Arkansas State Hwy. Employees Local 1315 v. Kell* (C.A.8, 1980), 628 F.2d 1099, a state statute authorized the public employer to deduct union dues from public employees' pay, but the public employer had discontinued its practice of deducting union dues from members' wages. The court found no First Amendment duty for the employer to provide payroll deduction for union dues and, under the rational basis standard, no equal protection violation. In the present appeal, appellants do not argue that public employers must deduct voluntary political contributions of employees; they contest the legislature's withdrawal of the discretionary authority of a public employer to do so.

For the above reasons, appellees have not established that R.C. 3599.031(H) is necessary to further compelling state interests or will directly and materially

prevent harm to significant state interests. Consequently, appellees have not justified the burden R.C. 3599.031(H) imposes on public employees' rights of equal protection and free speech, and R.C. 3599.031(H) is unconstitutional.

Appellants' first assignment of error is sustained, R.C. 3599.031(H) is unconstitutional, and R.C. 3599.031(I) is unconstitutional as it affects R.C. 3599.031(H). Its validity otherwise is not before this court.

In their second assignment of error, appellants assert that the trial court erred when it upheld the constitutionality of R.C. 3517.092(F) and 3517.99(N)(1). R.C. 3517.092(F) prohibits a public employee from being solicited for, or from soliciting, contributions while the employee is performing official duties or is in an area where official business occurs. R.C. 3517.99(N)(1) provides that whoever solicits a contribution in violation of R.C. 3517.092 is guilty of a first-degree misdemeanor.

Relying on the Ohio Constitution, appellants allege that the restrictions R.C. 3517.092(F) imposes on solicitation of or by public employees for political contributions infringe upon their constitutional rights of free speech and assembly and are unconstitutionally vague and overly broad in violation of due process. The trial court found that R.C. 3517.092(F) serves compelling interests of promoting bipartisan public support of government and confidence in the system of government, and reducing partisan pressure on or by public employees.

R.C. 3517.092(F) provides as follows:

"(1) No public employee shall solicit a contribution from any person while the public employee is performing the public employee's official duties or in those areas of a public building where official business is transacted or conducted.

"(2) No person shall solicit a contribution from any public employee while the public employee is performing the public employee's official duties or is in those areas of a public building where official business is transacted or conducted.

"(3) As used in division (F) of this section, 'public employee' does not include any person holding an elective office."

R.C. 3517.092(A)(6) defines "contribution":

" 'Contribution' includes a contribution to any political party, campaign committee, political action committee, or legislative campaign fund." [1]

R.C. 3517.092(F) has two distinct parts: in (F)(1), the government as employer restricts solicitation by public employees; in (F)(2), the government as sovereign

---

1. Although "includes" may permit an interpretation that "contribution" as used in R.C. 3517.092 is not limited to contributions to the political entities listed, this court interprets it as referring only to political contributions.

restricts any person's solicitation of public employees. Different analytical standards apply to the two parts. The *NTEU/Pickering* balancing test applies to the restrictions the government as employer has imposed on public employees. Standard First Amendment analysis applies to the restrictions the government as sovereign has imposed.

In *Broadrick*, relying on *Letter Carriers*, the Supreme Court upheld a state statute that prohibited partisan political solicitation by classified employees. In *Letter Carriers*, the Supreme Court found that the Hatch Act's ban on public employee participation in partisan politics, including soliciting campaign contributions, served important government interests of ensuring impartial execution of the law, ensuring that the government workforce not be used to build a powerful corrupt political machine, and protecting employees from coercion. *Letter Carriers*, 413 U.S. at 565–566, 576, 93 S.Ct. at 2890–2891, 2896, 37 L.Ed.2d at 808–810, 815, fn. 21. Applying *Pickering*'s balancing test, the Supreme Court found that Congress' interests sustained the limitations on partisan political activities. *Id.* at 564, 93 S.Ct. at 2890, 37 L.Ed.2d at 808.

R.C. 3517.092(F)(1) limits its restriction on solicitation to when the public employee is performing the public employee's official duties or when the public employee is in areas of a public building where official business is transacted or conducted. R.C. 3517.092(F)(1) does not restrict public employees from soliciting political contributions outside these parameters. In light of the state's important interest in disassociating government operations from partisan politics and R.C. 3517.092(F)(1)'s limited application, R.C. 3517.092(F)(1) does not violate rights of free speech under the Ohio Constitution.

R.C. 3517.092(F)(2) restricts any person from soliciting a public employee for a political contribution while the employee is working or in areas of a public building where official business occurs.

Soliciting for political contributions falls within the rubric of protected First Amendment speech. *United States v. Kokinda* (1990), 497 U.S. 720, 725, 110 S.Ct. 3115, 3118, 111 L.Ed.2d 571, 580. However, the First Amendment does not guarantee access to all government property to people who wish to exercise their right to engage in constitutionally protected speech. *Cornelius v. NAACP Legal Defense & Educational Fund* (1985), 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567, 577–578; *Perry Edn. Assn. v. Perry Local Educators' Assn.* (1983), 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 805.

In recognition of the government's authority to preserve the property under its control for its lawfully intended use, the Supreme Court applies a forum analysis to determine "when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the

property for other purposes." *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448, 87 L.Ed.2d at 578–579. Under this analysis, the character of the public property at issue determines the standard under which the question of access is determined and, hence, the extent to which the government can control access. *Id.* at 800, 105 S.Ct. at 3448, 87 L.Ed.2d at 578–579; *Perry,* 460 U.S. at 44, 103 S.Ct. at 954, 74 L.Ed.2d at 803–804.

■ There are three categories of fora: (1) traditional public fora, "places which by long tradition or by government fiat have been devoted to assembly and debate"; (2) limited, or designated, public fora, "public property which the State has opened for use by the public as a place for expressive activity"; and (3) nonpublic fora, "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–955, 74 L.Ed.2d at 804–805.

■ Strict scrutiny is applied when the government denies access to traditional and limited public fora. *Kokinda,* 497 U.S. at 726, 110 S.Ct. at 3119, 111 L.Ed.2d at 581. Under this standard, the government must establish that content-based exclusions are necessary to serve a compelling state interest and are narrowly drawn to achieve that end. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955, 74 L.Ed.2d at 804–805. The state may enforce content-neutral time-place-manner regulations that are narrowly tailored to serve a significant government interest and leave open ample alternate channels of communication. *Id.* at 45–46, 103 S.Ct. at 955, 74 L.Ed.2d at 804–805.

■ To justify denial of access to nonpublic fora, the government need only meet a reasonableness standard. *Kokinda,* 497 U.S. at 726, 110 S.Ct. at 3119, 111 L.Ed.2d at 581 "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805.

■ The initial determination to be made is to define the relevant forum. *Cornelius,* 473 U.S. at 801, 105 S.Ct. at 3448, 87 L.Ed.2d at 579. Identifying the government property at issue does not complete the analysis. Once it is determined that access is sought to public property, the analysis focuses on the access sought. *Id.* at 801, 105 S.Ct. at 3448, 87 L.Ed.2d at 579. When general access is sought, the forum encompasses the entire property; however, when limited access is sought, the perimeters of the forum are tailored to the access sought. *Id.* at 801, 105 S.Ct. at 3448, 87 L.Ed.2d at 579.

■ The primary activity R.C. 3517.092(F)(2) targets is solicitation of public employees while they are working in areas of public buildings where official business is being transacted. Thus, the forum is public buildings where official business is being transacted. A government workplace during work hours, like any place of employment, is geared toward accomplishing the government's business and is a nonpublic forum. See *Cornelius,* 473 U.S. at 805–806, 105 S.Ct. at 3450–3451, 87 L.Ed.2d at 581–583. Therefore, if the restriction is reasonable, it is constitutional.

■ Appellees defend R.C. 3517.092(F)(2) on the ground that it advances the *state's goals of increasing public worker efficiency and decreasing the role of politics in the provision of public services.*

This court finds that solicitation and political activity are disruptive to workplace efficiency and concludes that the ban on solicitation of political contributions in public buildings where official business is being conducted is reasonable. See *Cornelius,* 473 U.S. at 813, 105 S.Ct. at 3454, 87 L.Ed.2d at 587; *Kokinda,* 497 U.S. at 723–733, 110 S.Ct. at 3117–3123, 111 L.Ed.2d at 579–585; and *Internatl. Soc. for Krishna Consciousness, Inc. v. Lee* (1992), 505 U.S. 672, 683, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541, 552–553.

As appellants note, the wording of R.C. 3517.092(F)(2) does not restrict its application to solicitation of public employees while they are working in public buildings where official business is transacted and arguably applies to scenarios such as an after-school union meeting held at the school. This court recognizes that, as applied to such a scenario, R.C. 3517.092(F)(2) raises free speech issues; however, that issue is not before this court in this action.

For purposes of addressing the facial constitutionality of R.C. 3517.092(F)(2), this court holds its primary application to be constitutional and does not hold that it prohibits constitutionally protected conduct. R.C. 3517.092(F)(2) is facially constitutional.

Appellants' second assignment of error is overruled.

■ In their third assignment of error, appellants assert that the trial court erred when it held that R.C. 3517.082(D)'s requirements that all solicitation of contributions for a labor organization's PAC from its members and employees must be in writing and limited to four times per year were substantially overbroad and unconstitutional, but did not declare division (E) unconstitutional.

R.C. 3517.082 provides as follows:

"(D) Solicitations of contributions pursuant to division (B) of this section from * * * members and employees of a labor organization other than executive and

administrative employees of a labor organization shall be in writing and shall not be made more than four times during each calendar year. * * *

"(E) In addition to the laws listed in division (A) of section 4117.10 of the Revised Code that prevail over conflicting agreements between employee organizations and public employers, this section prevails over any conflicting provisions of agreements between labor organizations and public employers pursuant to Chapter 4117. of the Revised Code."

Although unenforceable against the provisions found unconstitutional, the language of division (E) does not limit its application to those provisions. Nor does the record establish that division (E)'s prohibition applies solely to those portions of division (D) found to be unconstitutional. The issue of whether division (E) has any constitutional application beyond (D) is not before this court. Accordingly, appellants' third assignment of error is overruled.

In their fourth assignment of error, appellants assert that the trial court erred when it failed to enter preliminary and permanent injunctions against implementation of the Ohio Revised Code sections challenged in the first, second, and third assignments of error.

Pursuant to an agreed order of the parties and Civ.R. 65(B)(2), the trial on the merits of appellants' complaint for declaratory and injunctive relief was consolidated with the hearing on their application for preliminary injunction. Following oral argument, the common pleas court issued its decision and order granting preliminary and permanent injunctive relief enjoining enforcement of the provisions of R.C. 3517.082(D) requiring labor organization solicitation of contributions from its members to be in writing and limiting solicitation to four times a year. The trial court found the remaining challenged provisions to be constitutional and did not enjoin their enforcement.

Injunctive relief is warranted when a statute is unconstitutional, enforcement will infringe upon constitutional rights and cause irreparable harm, and there is no adequate remedy at law. *Olds v. Klotz* (1936), 131 Ohio St. 447, 6 O.O. 129, 3 N.E.2d 371, paragraph two of the syllabus. Loss of the constitutional rights of speech and assembly for a minimal time results in irreparable harm. *Elrod,* 427 U.S. at 373, 96 S.Ct. at 2689–2690, 49 L.Ed.2d at 565.

In light of this court's determination that R.C. 3599.031(H) is facially unconstitutional, the importance of the rights that enforcement of these provisions would infringe upon, and the irreparable harm that enforcement would cause, on remand injunctive relief against enforcement of R.C. 3599.031(H) is warranted.

Appellants' fourth assignment of error is sustained as to R.C. 3599.031(H).

■ In their fifth assignment of error, appellants assert that the trial court erred when it upheld the constitutionality of the prohibitions R.C. 3599.03(A) and (B) impose on the direct and indirect use of labor union money to engage in partisan political expression. Thus, labor organizations cannot contribute to or make independent expenditures for partisan political purposes.

R.C. 3599.03 was amended by S.B. 8 to extend to labor organizations its existing prohibitions on partisan political spending by corporations and nonprofit corporations. It provides, in part, as follows:

"(A) Except to carry on activities specified in sections 3517.082 and 3599.031 of the Revised Code and except as provided in divisions (D), (E), and (F) of this section, no corporation, no nonprofit corporation, and no labor organization, directly or indirectly, shall pay or use, or offer, advise, consent, or agree to pay or use, the corporation's money or property, or the labor organization's money, including dues, initiation fees, or other assessments paid by members, or property, for or in aid of or opposition to a political party, a candidate for election or nomination to public office, a political action committee, a legislative campaign fund, or any organization that supports or opposes any such candidate, or for any partisan political purpose, shall violate any law requiring the filing of an affidavit or statement respecting such use of those funds, or shall pay or use the corporation's or labor organization's money for the expenses of a social fundraising event for its political action committee if an employee's or labor organization member's right to attend such an event is predicated on the employee's or member's contribution to the corporation's or labor organization's political action committee.

" * * *

"(B) No officer, stockholder, attorney, or agent of a corporation or nonprofit corporation, no member, including an officer, attorney, or agent, of a labor organization, and no candidate, political party official, or other individual shall knowingly aid, advise, solicit, or receive money or other property in violation of division (A) of this section.

"Whoever violates division (B) of this section shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both."

Appellants assert that R.C. 3599.03(A) and (B) violate their rights to free speech and association, equal protection, and liberty guaranteed by the Ohio Constitution.

A major purpose of the First Amendment's concern both with individual self-expression and with open and informed discussion is to promote free discussion of government affairs. *First Natl. Bank of Boston v. Bellotti* (1978), 435 U.S. 765, 776–777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707, 717–718, fn. 12. Furthermore, the

First Amendment intended discussion of public issues to be an "uninhibited, robust, and wide-open" debate. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 700–701.

The General Assembly has deemed that unions themselves may not directly express partisan political views, that they may engage in the political process only indirectly and only after going to the extra effort of establishing and administering a PAC. The prohibition on use of union general funds that R.C. 3599.03(A) and (B) impose burdens a union's exercise of political speech. See *Austin*, 494 U.S. at 658, 110 S.Ct. at 1396–1397, 108 L.Ed.2d at 663–664; *MCFL*, 479 U.S. at 252, 107 S.Ct. at 624–625, 93 L.Ed.2d at 552–553. Prohibitions such as this that are based both on the speaker's identity and content are "the rawest form of censorship." *Austin*, 494 U.S. at 700, 110 S.Ct. at 1419, 108 L.Ed.2d at 690–691 (Kennedy, J., dissenting).

The amendment of R.C. 3599.03 to include labor unions within its ambit is not the removal of a preference, as appellees choose to characterize it; rather, it is the imposition of a restriction on core First Amendment speech. That the prohibition also applies to corporations is irrelevant; the constitutionality of R.C. 3599.03(A) and (B) as to corporations is not before this court.

Regulation of First Amendment rights is subject to exacting judicial review; the significance of the government interest advanced must justify the regulation's infringement on First Amendment rights. *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley* (1981), 454 U.S. 290, 294, 299, 102 S.Ct. 434, 436, 439, 70 L.Ed.2d 492, 497–498, 500–501. A statutory provision that burdens First Amendment rights must be justified by a compelling state interest. *MCFL*, 479 U.S. at 256, 107 S.Ct. at 627, 93 L.Ed.2d at 555. Compelling interests are "[p]reserving the integrity of the electoral process, preventing corruption, * * * 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government' * * * [and] [p]reserv[ing] the individual citizen's confidence in government." *Bellotti*, 435 U.S. at 786–789, 98 S.Ct. at 1421–1423, 55 L.Ed.2d at 724–726. Generally, the more severe the restriction on protected political expression and association, the more important the competing government interest must be, and the tighter the relation between the restriction and the harm sought to be eliminated must be. See *Buckley*, 424 U.S. at 23, 25–26, 44–46, 96 S.Ct. at 636–637, 637–638, 646–648, 46 L.Ed.2d at 690, 691–692, 702–703.

Appellees do not argue that the compelling-interest standard does not apply to restrictions on protected political expression of labor organizations or that they do not have the full extent of First Amendment protection their individual members possess. Because this court does not find that the First Amendment

implicitly requires either finding, we will not dilute a labor organization's right to engage in political expression.

Can appellees completely prohibit labor organizations from using their money to express their views on partisan electoral issues? In other words, can a labor organization as a labor organization be prohibited from speaking? To answer this question, the harm sought to be prevented must be identified and weighed against the constitutional infringement. A total prohibition on the use of union funds suggests that the harm is union expression. This court is aware of no inherent threat to a compelling state interest to be found in the expression of political views of unions. To the contrary, "[t]he inherent worth of the speech [discussion of governmental affairs] in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *Bellotti,* 435 U.S. at 777, 98 S.Ct. at 1416, 55 L.Ed.2d at 718.

History reveals the problem that prompted the original prohibition on partisan political expression of corporations and labor organizations to be concern over elections being improperly influenced by "big money" campaign contributions, and the belief that executive officers and union leadership should not be allowed to spend stockholders' money or union funds to support political positions. *United States v. Congress of Indus. Organizations* (1948), 335 U.S. 106, 113, 115, 68 S.Ct. 1349, 1353, 1354, 92 L.Ed. 1849, 1856–1857, 1857–1858; *United States v. Internatl. Union* (1957), 352 U.S. 567, 572, 576–577, 77 S.Ct. 529, 531–532, 533–534, 1 L.Ed.2d 563, 567–568, 570–571. Despite the fact that large contributions were clearly the evil Congress feared when it first subjected corporations (in 1907) and then labor unions (in 1943) to spending prohibitions on political speech, *id.* at 575, 579, 77 S.Ct. at 533, 535, 1 L.Ed.2d at 569–570, 571–572, instead of restricting the amount corporations and unions could spend, Congress imposed a complete ban on such spending. The record before this court indicates that the Ohio General Assembly's concern was also the influence of "big money."

The Supreme Court has not addressed the facial constitutionality of the federal parallel to R.C. 3599.03(A) and (B), Section 441b, Title 2, U.S.Code, *as applied to labor organizations;* however, in *Austin,* it upheld the constitutionality of an analogous state statute as applied to corporations.

In support of R.C. 3599.03(A) and (B), appellees assert that the prohibitions are justified by the interests of preventing corruption or the appearance of corruption created by the amassing of war chests and protecting union members who oppose the political views espoused by the union. Neither of these interests persuades this court that appellees have met their burden.

Appellees argue that protecting the interests of dissenting union members justifies the prohibition. The members of appellant UAW who object to a portion

of their union dues going to political expenditures may file a notice of objection during the first fourteen days of union membership and during the fourteen days following each anniversary of union membership. The trial court questioned the effectiveness of this provision in ensuring that union dues spent on political expression reflect support of the members' views.

Assuming *arguendo* that protecting minority rights of union members constitutes a compelling state interest and that the present UAW system is ineffective, this court does not accept that nothing short of a total ban on the use of union funds will suffice to protect minority interests. A total ban on the ability of a union to expend its general funds to engage in partisan political expression "is, indeed, burning down the house to roast the pig." *Internatl. Union,* 352 U.S. at 596, 77 S.Ct. at 543–544, 1 L.Ed.2d at 580–581 (Douglas, J., dissenting). Furthermore, the prohibition is underinclusive in that it does not seek to protect the minority interests of union members who oppose political expenditures not covered by R.C. 3599.03. Accordingly, appellees have not established a sufficient correlation between their interest in protecting minority rights and a labor organization's political expression.

Appellees also argue that avoiding corruption or the appearance of corruption is a compelling government interest and justifies R.C. 3599.03(A) and (B). However, the only corruption concern clearly applicable to unions that the Supreme Court has recognized is that of the financial *quid pro quo.* Additionally, the Supreme Court has recognized the implication of the financial *quid pro quo* corruption only in the context of contributions, not independent expenditures.

In *Austin,* the Supreme Court upheld independent expenditure limits on corporations as sufficiently narrowly tailored to achieve their goal of forwarding a compelling state interest. The Supreme Court reached this conclusion by recognizing a new corruption concern: the "corrosive and distorting effects of immense aggregations of wealth *that are accumulated with the help of the corporate form* and that have little or no correlation to the public's support for the corporation's political ideas." (Emphasis added.) *Austin,* 494 U.S. at 660, 110 S.Ct. at 1397–1398, 108 L.Ed.2d at 664–665.

Appellees argue that the corruption concern recognized in *Austin* is equally compelling in the context of unions. However, crucial differences between unincorporated labor organizations and corporations do not support applying *Austin*'s analysis to analogous restrictions against unincorporated labor organizations.

*Austin* recognized that crucial differences between unions and corporations justified Michigan's decision to exclude unincorporated labor unions from the restriction at issue on corporate political expenditures. *Austin,* 494 U.S. at 666, 110 S.Ct. at 1401, 108 L.Ed.2d at 668–669. The Supreme Court identified one

crucial difference to be that an unincorporated union amasses its treasury without the help of the state-conferred advantage that a corporate structure bestows. *Id.* at 665, 110 S.Ct. at 1400, 108 L.Ed.2d at 668. As the court noted, a large amount of wealth in and of itself would not justify the restriction; rather, the state-conferred advantages of corporate structure that facilitate the amassing of wealth justified the restriction. *Id.* at 660, 110 S.Ct. at 1397–1398, 108 L.Ed.2d at 664–665. In fact, corporate structure was the express basis for the new corruption concern the court recognized to uphold the restriction on corporate independent political expenditures.

A second crucial difference *Austin* recognized is that funds available to a union for political expression more accurately reflect member support because of the refund procedure available to members who object to a union's political activities. *Id.* at 665, 110 S.Ct. at 1400, 108 L.Ed.2d at 668. Another attribute of labor unions that promotes an accurate correspondence between members' support and the amount of funds devoted to political expression is the democratic structure of unions; the union officials who make the spending decisions have been elected to their position by union members.

These differences between unions and corporations are significant because they pertain to the fundamental concern that the amount of funds available for political expression be a function of its popular support. *MCFL,* 479 U.S. at 259, 107 S.Ct. at 628–629, 93 L.Ed.2d at 557. General corporate funds indicate a corporation's economic success, not popular support for the corporation's political views. *MCFL,* 479 U.S. at 258–259, 107 S.Ct. at 628–629, 93 L.Ed.2d at 556–557. In contrast, as discussed above, union funds available for political expression reflect the collective sentiment of the individual members.

Although the concern of corruption may justify disclosure requirements and the imposition of a monetary limit on union partisan political contributions, it does not justify a complete ban on the use of union funds to engage in political expression. The view a union expresses by way of a contribution or independent expenditure, in and of itself, does not threaten the electoral process.

The trial court cases appellees rely on are not persuasive. *Michigan State AFL–CIO v. Miller* (E.D.Mich.1995), 891 F.Supp. 1210, affirmed in part and reversed in part on other grounds, 103 F.3d 1240 (C.A.6, 1997), was a preliminary injunction proceeding that addressed the constitutionality of a state statute prohibiting direct contributions or expenditures by labor organizations to or on behalf of candidates for state and local political office. The court did not independently analyze the issue under the compelling-government-interest standard. Instead, the court relied primarily on *Austin*'s silence as to the constitutionality of a restriction on labor union political expenditures to conclude that the state prohibition was constitutional. This reasoning is utterly lacking in persua-

siveness; the constitutionality of a prohibition on labor organization political expenditures *was not before the court* in *Austin.*

In *United States v. Sun–Diamond Growers of California* (D.D.C.1996), 941 F.Supp. 1277, the court held that the limitations of Section 441b(a), Title 2, U.S.Code on contributions to candidates as applied to corporate postelection contributions did not violate the First Amendment. The court did not consider the issue before this court, nor did the court discuss why corporate contributions of any amount implicate corruption concerns.

In *Clifton v. Fed. Election Comm.* (D.Me.1996), 927 F.Supp. 493, modified (C.A. 1, 1997), 114 F.3d 1309, the constitutionality of prohibiting the expenditure of general union funds to engage in partisan political expression was not before the court. In dicta, the court noted that contributions from a corporation, and union general funds to a candidate, may constitutionally be prohibited, citing *Buckley, MCFL,* and *Fed. Election Comm. v. Natl. Conservative Political Action Commt.* (1985), 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455; these Supreme Court cases did not address the constitutionality of wholesale restrictions on partisan political expression from a union's general funds.

In *Internatl. Assn. of Machinists & Aerospace Workers v. Fed. Election Comm.* (C.A.D.C.1982), 678 F.2d 1092, the union plaintiff challenged a congressional amendment to the Federal Election Campaign Act that enlarged the pool of people a corporate PAC was allowed to solicit. *Id.* at 1105. The court found that the amendment was substantially related to the important objective of impartially treating corporations and labor unions and did not deprive the plaintiffs of equal protection. *Id.* at 1109. The fact that the contested restrictions in the present appeal also apply to corporations is irrelevant to our consideration of whether the restrictions violate the free speech and association rights of appellant unions.

The prohibition on direct partisan political expression by labor organizations strikes at the core of the electoral process and constitutional freedom of speech. Substantial portions of the prohibited expression have not been sufficiently linked to the corruption dangers associated with large contributions; consequently, appellees have not shown that their interest in preventing corruption or the appearance of corruption justifies their wholesale restriction on unions' direct engagement in protected political expression.

"Some may think that one group or another should not express its view in an election because it is too powerful, because it advocates unpopular ideas, or because it has a record of lawless action. But these are not justifications for withholding First Amendment rights from any group—labor or corporate. * * * First Amendment rights are part of the heritage of all persons and groups in this country. They are not to be dispensed or withheld merely because we or the

Congress thinks the person or group is worthy or unworthy." *Internatl. Union,* 352 U.S. at 597, 77 S.Ct. at 544, 1 L.Ed.2d at 581–582 (Douglas, J., dissenting).

For the above reasons, R.C. 3599.03(A) and (B), as to unincorporated labor organizations, are unconstitutional, and appellants' fifth assignment of error is sustained.

In their sixth assignment of error, appellants assert that the trial court erred in determining their constitutional challenge to R.C. 3599.03(F), which permits nonprofit corporations, but not corporations and labor organizations, to use their treasury funds for communications about political matters if the predominant recipients of the communication are the stockholders, members, donors, trustees, or officers. Although our ruling on the fifth assignment of error moots this assignment of error, we note that the trial court ruled that R.C. 3599.03 must be interpreted as not prohibiting expenditures upon internal political communications within a labor organization.

Appellants' sixth assignment of error is overruled as moot.

In their seventh assignment of error, appellants assert that the trial court erred when it upheld the constitutionality, as applied to labor organizations, of the mandatory notices required in connection with solicitation of contributions under R.C. 3517.082(D), 3517.09(C), and 3599.031(B).

R.C. 3517.082(D) provides:

"Any person who solicits any employee of a corporation or member or employee of a labor organization for a contribution to a political action committee established or administered by the corporation or labor organization under division (A)(1) of this section shall inform the employee or member at the time of the solicitation that he may refuse to make a contribution without suffering any reprisal."

R.C. 3517.09(C) provides:

"An employer or labor organization that, directly or through another person, solicits an employee of the employer or a member of the labor organization for a contribution to a candidate, campaign committee, political action committee, legislative campaign fund, or political party shall inform the employee or member at the time of the solicitation that making a contribution is voluntary and that a decision of the employee or member to make a contribution or not to make a contribution will not benefit the employee or member or place the employee or member at a disadvantage with respect to his employment by the employer or his membership in the labor organization."

R.C. 3599.031(B) provides:

"Any person who solicits an employee to authorize a deduction from his wages or salary pursuant to division (A) of this section shall inform the employee at the time of the solicitation that he may refuse to authorize a deduction, and that he may at any time revoke his authorization, without suffering any reprisal."

Thus, the above statutes require any person or labor organization who solicits an employee to authorize a payroll deduction to a PAC or a separate segregated fund, or who solicits political contributions from a member or employee of the labor organization, to inform the solicitee at the time of solicitation that he may refuse to authorize the deduction or make the contribution without fear of reprisal and that deciding to contribute will not benefit the member with respect to his membership.

The trial court determined that these restrictions were content-based, but found that they were narrowly tailored to serve the compelling government interest of preventing corruption by ensuring that the contributions are voluntary.

The trial court properly determined that the above restrictions are content-based regulations of protected speech. *Riley v. Natl. Fedn. of the Blind of N. Carolina* (1988), 487 U.S. 781, 795, 108 S.Ct. 2667, 2676–2677, 101 L.Ed.2d 669, 688. A statute that compels a statement of fact to be made in conjunction with a solicitation for political contributions is subjected to exacting First Amendment scrutiny. *Id.* at 796–798, 108 S.Ct. at 2677–2679, 101 L.Ed.2d at 688–690.

Appellees assert that the statutes seek to eliminate coercion and corruption and notes that federal counterparts to Ohio's statutes exist at Section 441b(b)(3)(C), Title 2, U.S.Code, and Section 114.5(a)(4), Title 11, C.F.R. Section 441b(b)(3)(C), Title 2, U.S.Code, provides that it is unlawful for any person soliciting an employee for a contribution to a separate segregated political fund to fail to inform the employee at the time of the solicitation that he has a right to refuse to contribute without facing reprisal. Section 114.5(a)(4), Title 11, C.F.R., other than applying to solicitations of employees and members of a labor organization, is analogous to Section 441b(b)(3)(C), Title 2, U.S.Code.

There is no question that the asserted interests are significant and serve to protect the constitutional right of a solicitee to make only voluntary contributions. See *Abood v. Detroit Bd. of Edn.* (1977), 431 U.S. 209, 234–235, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261, 283–285. The key issue is whether appellees have established that the restrictions are sufficiently tailored to justify their burden on appellants' constitutional right of free speech.

R.C. 3517.09(B) prohibits any person from coercing, intimidating, or causing harm to another because that person makes or does not make a contribution. Thus, R.C. 3517.09(B) directly prohibits solicitation that results in involuntary

contributions and does so without burdening protected speech. The contested statutes also seek to prevent involuntary contributions; however, they do so by burdening protected speech.

The record does not support the need for a measure that compels speech. As long as the solicitation style is not coercive, intimidating, or harmful, this court has no reason to conclude that persons who are solicited will not understand that a voluntary, as opposed to mandatory, contribution has been solicited.

This court finds that the provisions of R.C. 3517.082(D), 3517.09(C), and 3599.031(B) mandating statements of fact in conjunction with solicitation of political contributions from employees or members of labor organizations are not sufficiently tailored to justify their burden on protected speech and are, accordingly, unconstitutional.

Appellants' seventh assignment of error is sustained.

In their eighth assignment of error, appellants assert that the trial court erred when it did not consider the constitutionality of R.C. 3517.08(C), 3517.08(B)(2), 3517.102(B)(6)(b)(ii), 3517.102(B)(6)(b)(iii), and 3517.102(B)(6)(d), which treat continuing associations, political parties, and legislative campaign funds more favorably than labor organizations and PACs. Although both parties restrict their arguments to the merits of the equal protection claim, this court limits its consideration of the eighth assignment of error to whether the trial court correctly determined that the equal protection claim was not properly before it.

R.C. 3517.08(B)(2) excludes from consideration as contributions or expenditures political party expenditures on mailed publications or other direct communication to inform predominantly its members of its activities or endorsements. Under (B)(1), for this type of expenditure by a PAC to be excluded from being considered a contribution or expenditure, the communications must be made only to its members. Additionally, (B)(2) excludes from consideration as a contribution or expenditure political party expenditures "for voter contact such as sample ballots, absent voter's ballot application mailings, voter registration, or get-out-the-vote activities"; this exclusion does not apply to PACs.

R.C. 3517.08(C) provides that expenditures by continuing associations or political parties for purposes of staffing and maintaining their headquarters or for conducting political polls, surveys, indexes, or other types of measurements not on behalf of a specific candidate are not considered a contribution to or an expenditure by or on behalf of any campaign committee. S.B. 8 amended the definition of continuing association to exclude labor organizations. R.C. 3517.01(B)(4).

S.B. 8, at R.C. 3517.01(B)(15), creates the entity called a legislative campaign fund and defines it as a fund "established as an auxiliary of a state political party and associated with one of the houses of the general assembly."

R.C. 3517.102(B)(6)(b)(ii) and (iii) limit legislative campaign fund contributions to the campaign of a Senate candidate to $50,000 in a primary election period and $100,000 in a general election period, and $25,000 and $50,000, respectively, to the campaign of a House candidate. In-kind contributions are excluded from these limits.

R.C. 3517.102(B)(2)(a) through (c) sets a $2,500 limit on a PAC's contributions to the campaign committee of any one statewide candidate, Senate candidate, or House candidate in a primary or general election period.

The trial court ruled that the issue of whether differing contribution limits result in an equal protection violation was not properly before it because appellants asserted the argument for the first time in their reply brief.

The record establishes that appellants' third claim for relief in their original and amended complaints for declaratory and injunctive relief challenged the above statutes on grounds of equal protection, free speech and association, and due process. In their brief opposing the preliminary injunction motion, appellees noted that the motion did not address issues regarding the regulation of legislative campaign funds. Appellant UAW's reply brief to appellees' opposition brief includes an equal protection argument regarding the contribution limits of R.C. 3517.102(B)(6); however, it does not address the fact that a preliminary injunction does not appear to have been sought against enforcement of the provision.

The transcript of the trial on the merits consolidated with the hearing on the preliminary injunction application establishes that appellants argued their equal protection challenge to the above statutes.

Had the only matter before the trial court been the preliminary injunction, the equal protection challenge to the above statutes would not have been properly before the court. However, the trial court was also considering the merits of the complaint for declaratory and injunctive relief. Appellants' failure to seek a preliminary injunction against the provisions does not affect their request for declaratory relief and a permanent injunction. Appellants challenged the statutes on equal protection grounds in their complaint and at the hearing. Therefore, the constitutional challenge to R.C. 3517.08(B)(2) and (C), 3517.102(B)(6)(b)(ii) and (iii), and 3517.102(B)(6)(d) was properly before the trial court. To the extent the trial court should have addressed the merits of the equal protection challenge to the above provisions, the eighth assignment of error is sustained. This court will not address the merits of the issue for the first time

on appeal and will remand it to the trial court for consideration. *Mills–Jennings of Ohio, Inc. v. Liquor Control Comm.* (1984), 16 Ohio App.3d 290, 293, 16 OBR 321, 323–324, 475 N.E.2d 1321, 1324–1325.

In their ninth assignment of error, appellants assert that the trial court erred when it did not decide the constitutional challenge to R.C. 3517.082(B)(3). R.C. 3517.082(B) identifies those entities from whom corporations, nonprofit corporations and labor organizations may solicit contributions for their PACs and separate segregated funds.

R.C. 3517.082(B) provides:

"(B)(1) A corporation and a nonprofit corporation may solicit contributions from its stockholders, officers, directors, trustees that are not corporations or labor organizations, and employees.

"(2) A nonprofit corporation also may solicit contributions from:

"(a) Its members that are not corporations or labor organizations;

"(b) Officers, directors, trustees that are not corporations or labor organizations, and employees of any members of the nonprofit corporation.

"(3) A labor organization may solicit contributions from its members, officers, and employees."

Ohio Adm.Code 111–1–02(D)(2) provides that "member" is defined so that "members of a local labor union are also considered to be members of any national or international labor union [with] which the local labor union is affiliated and of any federation with which the local, national, or international labor union is affiliated."

The solicitation restrictions of R.C. 3517.082(B) concern corporate and labor organization spending in connection with elections. By assuming the expense of soliciting contributions, an association frees money the PAC or fund would have expended soliciting, thus enabling the PAC to channel more of its funds to independent expenditures or contributions in support of or opposition to a political issue.

Appellants assert that R.C. 3517.082(B)(3) discriminates arbitrarily and invidiously against labor organizations. In support of this position, appellants contrast the restrictions imposed on labor organizations against those imposed on for-profit and nonprofit corporations under R.C. 3517.082(B) and against the absence of restrictions on partnerships and other unincorporated professional and business associations.

Appellees note that R.C. 3517.082(B)(3) is modeled after Section 441b(b)(4)(A), Title 2, U.S.Code, and assert that, because appellants did not negate every

conceivable basis which might support the unequal treatment of labor organizations, as the rational basis standard requires, appellants' ninth assignment of error must be overruled. Appellees' reliance on the rational basis standard is misplaced. Political contribution solicitation is protected constitutional expression. *Kokinda,* 497 U.S. at 725, 110 S.Ct. at 3118–3119, 111 L.Ed.2d at 580. When a statute places unequal burdens on the protected political expression and association rights of groups, the restriction must be narrowly tailored to serve a compelling government interest. *Austin,* 494 U.S. at 666, 110 S.Ct. at 1401, 108 L.Ed.2d at 668–669. Appellees have not identified a valid distinction between labor organizations and unincorporated associations and partnerships that establishes an important reason to treat labor organizations differently. Therefore, appellees have not shown that the restriction serves a compelling state interest.

*Internatl. Assn. of Machinists v. Fed. Election Comm.* (en banc) (D.C.Cir. 1982), 678 F.2d 1092, is not dispositive. In *International Machinists,* plaintiffs challenged an amendment to Section 441b(b)(4)(A), Title 2, U.S.Code, which increased the solicitation pool of corporations and their PACs on equal protection grounds. Plaintiffs did not seek for unions and union PACs a comparable enlargement of their solicitation pool, nor did they challenge 441b's solicitation restrictions against labor organizations as opposed to the absence of restrictions against other unincorporated associations.

Finding the unequal burden on solicitation that R.C. 3517.082(B) imposes on labor organizations unjustified and, therefore, violative of equal protection guarantees, we sustain appellants' ninth assignment of error.

Appellees have cross-appealed and assert the following assignment of error:

"The trial court erred in ruling that portions of Ohio Revised Code Section 3517.082(D) violate the First Amendment."

R.C. 3517.082(D) provides, in part, as follows:

"Solicitations of contributions [to either a political action committee or a separate segregated fund of a corporation or labor organization] pursuant to division (B) of this section from employees of a corporation or members and employees of a labor organization other than executive and administrative employees of a corporation or officers and executive and administrative employees of a labor organization shall be in writing and shall not be made more than four times during each calendar year."

The trial court found that appellees had not demonstrated a compelling interest served by requiring solicitations for a labor organization's PAC to be in writing and made no more than four times per year and held these requirements substantially overbroad and unconstitutional.

In support of their assignment of error, appellees argue that the solicitation restrictions are reasonable time, place, and manner restrictions on the manner of fundraising. An intermediate level of scrutiny applies to reasonable restrictions on the time, place, or manner of protected speech. Under this standard, a restriction will be upheld if it is justified without reference to the content of the regulated speech, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–2754, 105 L.Ed.2d 661, 675.

The intermediate level of scrutiny does not apply to content-based restrictions. *Turner*, 512 U.S. at 642–643, 114 S.Ct. at 2459, 129 L.Ed.2d at 517–518. Restrictions " '*justified* without reference to the content of the regulated speech,' " are content neutral. *Boos v. Barry* (1988), 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333, 344, quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346, 364, and adding emphasis; *Seven Hills v. Aryan Nations* (1996), 76 Ohio St.3d 304, 306, 667 N.E.2d 942, 946. The term "content" does not refer solely to viewpoint based, but also refers to entire topics. *Boos*, 485 U.S. at 319, 108 S.Ct. at 1162–1163, 99 L.Ed.2d at 343–344. Laws that, by their terms, apply to speech based on the topic or viewpoint of the expression are content-based. *Burson v. Freeman* (1992), 504 U.S. 191, 197, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5, 13. Facially, content-based restrictions on political speech in public fora, or fora not owned or controlled by the government, are subjected to exacting scrutiny. *Id.* at 198, 112 S.Ct. at 1851, 119 L.Ed.2d at 13–14; *Boos*, 485 U.S. at 321, 108 S.Ct. at 1163–1164, 99 L.Ed.2d at 344–345; and *Consol. Edison Co. v. Pub. Serv. Comm.* (1980), 447 U.S. 530, 539–540, 100 S.Ct. 2326, 2334–2335, 65 L.Ed.2d 319, 329–330. Exacting scrutiny, not intermediate scrutiny, must be applied to R.C. 3517.082(D) because it is a facially content-based restriction on political speech. *Turner* and *Kokinda* did not involve restrictions whose terms distinguish between topics of speech and, consequently, do not support appellees' position that R.C. 3517.082(D)'s restrictions are content-neutral.

Under exacting scrutiny, appellees must show that the " 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Burson*, 504 U.S. at 198, 112 S.Ct. at 1851, 119 L.Ed.2d at 13–14. This court agrees with the trial court's conclusion that the restrictions are not necessary or narrowly tailored to serve the compelling interests appellees have cited to justify the restrictions. There is insufficient connection between preventing the corruption or appearance of corruption associated with large financial contributions and the solicitation at issue. Additionally, while some solicitation methods may be coercive, the breadth of the present solicitation

necessarily includes within its sweep a substantial amount of solicitation that does not trigger coercion concerns.

Appellees' assignment of error is overruled.

Appellants' first assignment of error is sustained as to R.C. 3599.031(H) and overruled as to R.C. 3599.031(I). Appellants' second and third assignments of error are overruled. Appellants' fourth assignment of error is sustained as to R.C. 3599.031(H) and overruled as to R.C. 3599.031(I), 3517.092(F), and 3517.082(E). Appellants' fifth assignment of error is sustained. Appellants' sixth assignment of error is overruled as moot. Appellants' seventh, eighth, and ninth assignments of error are sustained.

The judgment of the trial court is reversed in part and affirmed in part, and this cause is remanded for proceedings consistent with this opinion.

*Judgment reversed in part,*
*affirmed in part*
*and cause remanded.*

DESHLER, P.J., CLOSE and BOWMAN, JJ., concur.